JAQUICE LANKFORD

       **PLAINTIFF,**

v.

**CITY OF CLIFTON POLICE
DEPARTMENT; OFFICER ALAN
FIORILLA; OFFICER THOMAS
BUELL; OFFICER ANDREW
ALVAREZ; OFFICER JUAN VELEZ;
JOHN DOES 1-10, SUED
INDIVIDUALLY AND IN THEIR
OFFICIAL CAPACITIES**

       **DEFENDANTS**

Civ. No. 18-6643 (KM)(CLW)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**[1]

---

[1]    Citations to certain items in the record will be abbreviated as follows.:

"DE" = Docket entry number in this case.

Compl. = Plaintiff's Complaint (DE 1)

Buell MSJ = Thomas Buell's Motion for Summary Judgment (DE 40-34)

Buell SOMF = Statement of Facts Accompanying Thomas Buell's Motion for Summary
        Judgment (DE 40-3)

Clifton MSJ = City of Clifton's Motion for Summary Judgment (DE 41-2)

Clifton SOMF = Statement of Facts Accompanying City of Clifton's Motion for
        Summary Judgment (DE 41-1)

Pl.'s Buell Opp. = Plaintiff's Brief in Opposition to Thomas Buell's Motion for Summary
        Judgment (DE 45)

Pl.'s Clifton Opp. = Plaintiff's Brief in Opposition to the City of Clifton's Motion for
        Summary Judgment (DE 46)

Pl.'s SOMF = Plaintiff's Statement of Facts (DE 45)

Pl.'s RSOMF Buell = Plaintiff's Response to Thomas Buell's Statement of Facts (DE 45)

This is a civil rights case. Plaintiff Jaquice[2] Lankford claims that officers of the City of Clifton police department used excessive force when they struck him with batons during his arrest. Against the individual officers Mr. Lankford asserts claims pursuant to 42 U.S.C. § 1983, claiming false arrest, false imprisonment, excessive force, deprivation of property without due process, and a taking of property without just compensation. Against the City of Clifton Police Department (the "Police Department"),[3] he brings claims pursuant to § 1983 for failure to property train and supervise the individual defendants. He also appears to be bringing certain common law claims as well.[4]

---

Pl.'s RSOMF City = Plaintiff's Statement of Material Facts Accompanying its Opposition to the City of Clifton's Motion for Summary Judgment

Buell Reply = Thomas Buell's Reply to Plaintiff's Opposition (DE 51)

Clifton Reply = The City of Clifton's Reply to Plaintiff's Opposition (DE 52)

Clifton RSOMF = The City of Clifton's Responsive Statement of Facts to Plaintiff's Statement of Facts (DE 52-1)

[2] I apologize in advance if I have selected wrongly among inconsistent spellings of the parties' names by plaintiff's counsel. Plaintiff's first name is rendered as both Ja_quice_ (*see* Case Caption, Pl.'s Clifton Opp) and Jaquice (*see* Case Caption, Compl.). One police defendant's name is spelled as both Alv_a_rez and Alv_e_rez. (*see* Case Caption, Pl.'s Clifton Opp.; *but see also id.* at 1). The fourth officer to arrive on the scene is identified as both Velez and Valdez. (*see* Case Caption, Pl.'s Clifton Opp.; *but see also id.* at 9).

[3] Technically, the proper defendant is the City of Clifton. A New Jersey police department is not an independent entity with the capacity to sue and be sued, but only "an executive and enforcement function of municipal government." N.J. Stat. Ann.. § 40A:14–118. The case law under Section 1983 uniformly holds that the proper defendant is therefore the municipality itself, not Clifton. *See Jackson v. City of Erie Police Dep't*, 570 F. App'x 112, 114 (3d Cir. 2014) ("We further agree with the District Court that Clifton was not a proper party to this action. Although local governmental units may constitute 'persons' against whom suit may be lodged under 42 U.S.C. § 1983, a city police department is a governmental sub-unit that is not distinct from the municipality of which it is a part.") (citation omitted). S*ee also Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 n. 4 (3d Cir. 1997) (Court "treat[s] the municipality and its police department as a single entity for purposes of section 1983 liability")). I therefore refer to this defendant as "Clifton," but there is no change in substance.

[4] I say "appears" because Mr. Lankford's complaint is unclear. It begins with a "kitchen sink" paragraph, paragraph 1, which states that the claims "arise[] under the Fourth, Fifth and Fourteenth Amendments . . . under federal law, specifically, 42 U.S.C. §§ 1983 and 1988; for intentional and/or negligent infliction of emotional distress, conversion, loss of companionship, negligence, negligent supervision, gross

The City of Clifton and Officer Thomas Buell now move for summary judgment against Mr. Lankford's claims. I **GRANT IN PART** and **DENY IN PART** the motions for summary judgment.

## I.   BACKGROUND

### A. Facts

. The following are the facts forth in the parties' submissions. Where relevant factual disputes exist, they are noted.

Jacquice Lankford was driving in Clifton, New Jersey on April 16, 2016. (Buell SOMF ¶ 1.) Mr. Lankford's car bore a temporary New Jersey license plate. (*Id.*) Sergeant Alan Fiorilla of the Clifton Police Department was on patrol in the area at the time. (*Id.* ¶ 2.) Mr. Lankford pulled into a gas station and Sergeant Fiorilla followed him. (*Id.* ¶ 3.)

---

negligence, assault, false imprisonment, false arrest, and civil conspiracy." (Compl. ¶ 1.)

These very general allegations, moreover, do not distinguish between constitutional and state law tort claims. *Howell v. Cataldi*, 464 F.2d 272, 278 (3d Cir. 1972) ("It becomes important to delineate that conduct which is actionable in state courts as a tort, and that which is actionable in federal courts under § 1983. The two rights of action do not always stand in *pari materia*. Some common law and statutory torts, though actionable in a state forum, do not rise to constitutional dimensions. The converse is equally true."); *see also Smith v. Spina*, 477 F.2d 1140, 1143 (3d Cir. 1973) ("a tort committed by a state official acting under state law is [not], in and of itself, sufficient to show an invasion of a person's right under the Act [§ 1983] . . . ." so there was no federal jurisdiction over claims of negligence, res ipsa loquitur, and intentional assault and battery which were claimed as § 1983 violations) (quoting *Kent v. Prasse*, 385 F.3d 406, 407 (3d Cir. 1967)).

At any rate, a number of these claims or theories are never to be heard from again. The actual counts of the complaint which cite 42 U.S.C. § 1983 assert only two theories: excessive force and failure to train. No count makes any reference to the other theories except, again, under the heading of Section 1983 "General Allegations," which contains mentions of deprivation of property, Takings, false arrest, and false imprisonment, with no further elaboration.

For the purposes of these motions, I will construe these claims as consisting of excessive force and failure to train, as Officer Buell does in his motion for summary judgment. (Mr. Lankford appears to acquiesce, and has lodged no objection in his responding papers.) I also discuss false arrest and false imprisonment, because they are suggested by the facts and allegations of records. As to the other defendants, I leave open the question of whether Mr. Lankford's method of pleading was sufficient to put them on notice.

3

The parties dispute why Sergeant Fiorilla followed Mr. Lankford into the police station. According to Sergeant Fiorilla, Mr. Lankford's temporary license tag appeared to be fraudulent. (*Id.*) The Sergeant radioed dispatch with registration information for Mr. Lankford's vehicle and learned that the temporary plate was for a 2016 Toyota RAV4, not the 2004 Mercedes E-320 that Mr. Lankford was driving. (*Id.*) Mr. Lankford counters that Sergeant Fiorilla did not follow him to investigate his license plate, but rather because he had racially profiled Mr. Lankford. (Pl.'s RSOMF Buell ¶ 3.)

Sergeant Fiorilla parked his car at the gas station and approached Mr. Lankford's vehicle. (Buell SOMF ¶ 4.) Mr. Lankford had the hood of his vehicle up and was standing near the front, speaking to the gas station attendant. (*Id.*) Sergeant Fiorilla asked Mr. Lankford for his driving credentials, and Mr. Lankford asked why and if he had done anything wrong. (*Id.*) Sergeant Fiorilla claims to have told Mr. Lankford that he was stopping him for a traffic violation and said that he would explain after Mr. Lankford produced his credentials. (*Id.*) Mr. Lankford claims that Sergeant Fiorilla never mentioned any traffic violation. (Pl.'s RSOMF Buell ¶ 4.)

Mr. Lankford took out his phone and said that he was going to record the encounter. (Buell SOMF ¶ 5.) Sergeant Fiorilla claims that he asked Mr. Lankford to return to his car, and Mr. Lankford refused. (*Id.*) Sergeant Fiorilla then repeated his request and Mr. Lankford refused again. (*Id.*) Mr. Lankford, for his part, states that Sergeant Fiorilla never asked him to return to his vehicle. (Pl.'s RSOMF Buell ¶ 5.) Mr. Lankford then began to back away. (Buell SOMF ¶ 5.) Sergeant Fiorilla grabbed Mr. Lankford's right arm to guide him back to the vehicle, and Mr. Lankford pulled away and attempted to return to his vehicle. (*Id.*) Sergeant Fiorilla told Mr. Lankford he was under arrest, and Mr. Lankford continued to attempt to pull away. (*Id.* ¶¶ 5, 13)

Sergeant Fiorilla warned Mr. Lankford that he was going to use pepper spray. (*Id.* ¶ 6.) Mr. Lankford covered his face. (*Id.*) Fiorilla then took Mr. Lankford to the ground and commanded him to stop resisting. (*Id.*) Sergeant Fiorilla

attempted to gain control of Mr. Lankford's hands, which were underneath Lankford's body as he was lying face down, and Lankford refused to produce them. (*Id.*) Sergeant Fiorilla claims that he sought to control Mr. Lankford's hands because he was concerned that Lankford had a weapon. (*Id.*) According to a witness at the scene, Sergeant Fiorilla was screaming "give me your phone, give me your phone." (Pl.'s SOMF ¶ 12.) Both parties agree that this situation resulted in a stalemate which persisted for approximately 10 minutes, during which Mr. Lankford remained face down on the ground with his hands beneath him while Sergeant Fiorilla sat on top of him and sought to gain control of his hands. (*Id.*)

The parties dispute what happened next. According to Officer Buell, he arrived at the scene, approached Mr. Lankford and Sergeant Fiorilla, and unsuccessfully attempted to gain control of Mr. Lankford's right hand by pulling at his arm. (Buell SOMF ¶ 7.) Officers Juan Velez and Andrew Alvarez then arrived at the scene. (*Id.*) The officers ordered Mr. Lankford to stop resisting and display his hands, which he refused to do. (*Id.*) Officers Alvarez and Velez then struck Mr. Lankford on the legs with their batons, after which Mr. Lankford surrendered his hands and was handcuffed. (*Id.*) Officer Buell then transported Mr. Lankford to the Clifton Police Department Headquarters. (*Id.*) This version of events is supported by use of force reports prepared by Fiorilla, Alvarez and Velez.

Mr. Lankford acknowledges that he has no personal knowledge as to the identity of the officers at the scene or which officers struck him. (*Id.* ¶ 14.) He does, however, offer a different account of what occurred, based on a statement by an eyewitness bystander named Lindsey Fuchs Kennedy. (Pl.'s SOMF ¶ 11.) According to Ms. Kennedy, after the 10-minute stalemate between Sergeant Fiorilla and Mr. Lankford, Officer Alvarez arrived at the gas station, immediately got out of his car, took out a baton, and began to strike Mr. Lankford. (Pl.'s SOMF ¶ 13; Pl.'s Buell RSOMF ¶ 16.) A second police cruiser driven by Officer Buell then arrived. (Pl.'s SOMF ¶ 15.) Officer Buell got out of his car, spoke with the

other officers, then walked to Mr. Lankford, who was lying still on the ground with Sergeant Fiorilla on top of him. Buell pulled out his baton, and struck Mr. Lankford three times. (*Id.* ¶ 16.) Mr. Lankford then stopped resisting and was placed under arrest. (*Id.*) As will be discussed in greater detail below, Ms. Kennedy did not actually identify any officer by name—Mr. Lankford infers this order of arrival based on Ms. Kennedy's description of the officers' appearances.

According to Mr. Lankford, he had no knowledge that the license plate was fake and knew nothing about its origins. (Buell SOMF ¶ 9.) He explained that he did not want to produce his driver's license to Sergeant Lankford because his license was suspended at the time of the incident due to outstanding child support obligations. (*Id.*)

Mr. Lankford explained that he stopped at the gas station in order to check the car's oil because the oil sensor light had switched on. (*Id.* ¶ 10.) Plaintiff recalls that he had walked to a vending machine to get some snacks and was returning when he was approached by Sergeant Fiorilla. (*Id.* ¶ 11.) He claims that he put his hands in the air and kept them there as Sergeant Fiorilla became hostile and approached him. (*Id.* ¶ 12.) He acknowledges that Sergeant Fiorilla asked for his documents three times and that he continually asked Fiorilla why he had been stopped. (*Id.*) He also acknowledges that he did not follow Sergeant Fiorilla's commands to give up his hands once he was on the ground. (*Id.* ¶ 13.)

Sergeant Fiorilla confirms that he was on top of Mr. Lankford and trying to gain control of his hands when Officer Buell arrived. (*Id.* ¶ 15.) He also confirms that Officers Alvarez and Velez used baton strikes to Mr. Lankford's lower legs to gain control of his hands. (*Id.* ¶ 16.) Officer Alvarez states that he struck Mr. Lankford with a baton approximately three or four times on the shin while the officers were yelling commands to Mr. Lankford. (*Id.* ¶ 17.) Officer Alvarez does not recall if Officer Velez struck Mr. Lankford, but Officer Velez acknowledged using his baton on Mr. Lankford in his use of force report submitted in connection with the incident. (*Id.*; DE 40-5 at 4 (Use of Force Report, Officer Juan Velez).)

Mr. Lankford claims that Officer Buell then took him to police headquarters. (Pl.'s SOMF ¶ 20.) He claims that on the way to the station and while in police headquarters, Officer Buell began to call him racial epithets, including "blackass" and the n-word. (*Id.* ¶ 21–22.) Officer Buell then walked Mr. Lankford to a holding cell, and Mr. Lankford's legs were bleeding. (*Id.* ¶ 23.) Mr. Lankford asked to go to the hospital and Officer Buell responded "You're a fuckin asshole, you'll be alright." (*Id.* ¶ 24.) Mr. Lankford was taken to the hospital, however, after officers noticed a pool of blood emanating from his legs and clothes. (*Id.* ¶ 25.)

The Honorable J.M.C. Abdelmajeid Abdelhadi of Paterson Municipal Court found that Mr. Lankford's stop was unlawful because Sergeant Fiorilla lacked reasonable suspicion of a motor vehicle infraction or criminal conduct. (Pl.'s SOMF ¶ 6.) The Judge dismissed all charges. (*Id.*) In state court, Sergeant Fiorilla testified that he observed Mr. Lankford's car stopped at a light, behind two or three other cars (DE 45-3 Probable Cause Hearing Transcript 1T5:2–6.) He claimed that as he drove past Mr. Lankford's car, he noticed it lacked front plates; as he proceeded past the vehicle, he turned his head and saw a temporary tag on the back of the car with what seemed to be an unusual font for the tag's lettering, indicating fraud. (1T5:8–11.) Judge Abdelhadi explained that he did not believe Sergeant Fiorilla's explanation, for the following reasons: Sergeant Fiorilla could not recall where the rear plates were located on Mr. Lankford's vehicle; Fiorilla had submitted a report which did not indicate that Mr. Lankford's car lacked a front plate; there were two cars in front of Mr. Lankford's vehicle, which would have obstructed Sergeant Fiorilla's view; and it was not plausible that Sergeant Fiorilla would have been able to observe some anomaly in the lettering on Mr. Lankford's plate while traveling between 25 and 35 miles an hour past the car. (1T6:15–21, 7:4–5, 11–18, 8:13–22.) The Judge also noted that the state never produced Mr. Lankford's allegedly fraudulent tags, so he could not further evaluate the claim that the lettering appeared fake. (1T9:1–4.)

Mr. Lankford's expert, Captain Nicholas C. Sorrano, a retired New Jersey State Police officer, reviewed the incident and concluded that Alvarez and Velez failed to act in a professional manner and utilized excessive force. (*Id.* ¶ 21.) He further concluded that Sergeant Fiorilla failed to properly supervise Alvarez and Velez as they arrived. (*Id.* ¶ 22.) He criticized the officers' failure to use physical force, such as prying Mr. Lankford's arms from beneath his body, before moving on to mechanical force, such as beating Mr. Lankford with a baton. (*Id.*) Mr. Sorrano did not evaluate Officer Buell's behavior in his report.

Clifton Police Officers are hired after completing a certification process which includes (1) reference checks with their relatives, neighbors, landlords, employers, supervisors and co-workers, (2) criminal history background checks, (3) educational records checks, (4) credit checks, (5) military records checks where applicable, (6) motor vehicle driving records checks, (7) a physical exam, (8) a psychological exam, (9) juvenile background checks, (10) fingerprinting, (11) drug testing, (12) social media checks, (13) local law enforcement agency records checks. (Clifton SOMF ¶ 10.) All of the officers involved in Mr. Lankford's beating successfully completed their police academy training, received training updates on an annual basis, have never exhibited any dangerous propensities according to their personnel records, and have successfully completed the Attorney General's semi-annual use of force training. (*Id.* ¶¶ 11–15.)

According to N.J. Advance Media's Use of Force statistics, a Black person is 122% more likely to suffer a use of force by police in the City of Clifton than a White person is. (*Id.* ¶ 10.) Clifton's population is 7% Black, but 30% of Sergeant Fiorilla's uses of force involved Black individuals, as did 12.5% of Officer Buell's, 15.4% of Officer Alvarez's, and 26.7% of Officer Velez's. (*Id.* ¶ 12.)

## B. Procedural History

Mr. Lankford filed a complaint on April 13, 2018 against the City of Clifton, Clifton Police Department, Sergeant Fiorilla, and Officers Buell, Alvarez, and Velez. (DE 1.) The Complaint is far from clear, *see* pp. 2–3 & n.3, *supra*, but appears to cite the following claims:

- Pursuant to Section 1983: (1) an unreasonable search and seizure; (2) deprivation of liberty without due process; (3) deprivation of property without due process; (4) excessive force; (5) false arrest; (6) a Takings; (7) civil conspiracy; (8) *Monell* liability pursuant to a failure to supervise and train;

- Pursuant to New Jersey state tort law: (1) intentional infliction of emotional distress; (2) negligent infliction of emotional distress; (3) conversion; (4) loss of companionship; (5) negligence; (6) negligent supervision; (7) gross negligence; (8) assault; (9) false imprisonment; (10) false arrest; (11) civil conspiracy.

(*See* Compl. ¶¶ 1, 15.)

The defendants filed answers and crossclaims against one another (DE 3; DE 5; DE 6; DE 7; DE 8.) The parties then conducted fact discovery.

Presently before the court are motions for summary judgment by defendants Officer Buell and Clifton. (DE 40; DE 41.) Officers Alvarez, Velez, and Sergeant Fiorilla have not filed motions for summary judgment in this matter.

## II.    LEGAL STANDARD — MOTION FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex*, 477 U.S. at 322-23. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact

is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## III.   OFFICER THOMAS BUELL'S MOTION FOR SUMMARY JUDGMENT

Officer Buell moves for summary judgment on all of plaintiffs' claims. I **GRANT IN PART** and **DENY IN PART** his motion. Specifically, I grant the motion as against Mr. Lankford's excessive force and civil conspiracy claims pursuant to Section 1983, and against his assault and civil conspiracy claims under New Jersey tort law. I deny the motion as against the remainder of his claims. Because neither side seems to address them at all, I will also issue an Order to Show Cause directing the parties to give reason why I should not dismiss Mr. Lankford's claims for conversion, loss of companionship, deprivation of property without due process, and Takings.

### A. Mr. Lankford's § 1983 Claims

Mr. Lankford brings a number of claims under Section 1983,[5] including excessive force, civil conspiracy, false arrest, false imprisonment, deprivation of property without due process, and a Taking. Officer Buell moves for summary judgment on the excessive force and conspiracy claims, and I grant his motion.

### 1. Excessive Force

Mr. Lankford claims that Officer Buell is liable under 42 U.S.C. § 1983 for using excessive force in effectuating Lankford's arrest.[6] Officer Buell responds that he is protected by the doctrine of qualified immunity.

---

[5]    42 U.S.C. § 1983 states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

[6]    In his opposition, Mr. Lankford claims for the first time that Officer Buell is also liable for failure to intervene against the use of excessive force of his fellow officers. (Pl.'s Buell Opp. at 39–43.) This claim is not asserted in the complaint. A plaintiff may not "argue that defendant is liable on a theory not even alluded to in the complaint."

"The doctrine of qualified immunity insulates government officials who are performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982)). The U.S. Supreme Court has established a two-part analysis that governs whether an official is entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151 (2001). That two-part analysis inquires as to (1) whether the facts put forward by the plaintiff show a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Id.*; *James*, 700 F.3d at 679. Even if there are fact questions as to the first, constitutional-violation prong, the court is required to decide the second, *i.e.,* whether the right was clearly established. *See Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015) ("[W]hile issues of fact may preclude a definitive finding on the question of whether the plaintiff's rights have been violated, the court must nonetheless decide whether the right at issue was clearly established."). Because this is a motion for summary judgment, the court considers the facts in the light most favorable to the plaintiffs. *Couden v. Duffy*, 446 F.3d 483, 492 (3d Cir. 2006).

The first prong of the qualified immunity analysis asks whether a constitutional violation has occurred. Here, Mr. Lankford asserts a claim of excessive force. Excessive force claims arise from the Fourth Amendment's protection against unreasonable seizures. *Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citing *Graham v. O'Connor*, 490 U.S. 386, 394–95 (1989)). "[T]he central question is 'whether force was applied in a good

---

*Holland v. Macerich*, 2011 WL 6934969 at *4 (D.N.J. Dec. 29, 2011) (quoting *Watson v. Potter*, 2009 WL 424467 at *4 n.2 (N.D. Ill. Feb. 19, 2019)); *see also McMahon v. Salmond*, 573 Fed. Appx. 128, 135 (3d Cir. 2014) (where claim was not pled in the complaint, plaintiff may not raise it for the first time in his opposition to summary judgment). I therefore do not consider this failure-to-intervene theory.

faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Hudson v. McMillan*, 503 U.S. 1, 7 (1992)). The Court must determine whether the use of force in question was objectively reasonable in light of the facts and circumstances confronting an officer, which requires an evaluation of the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 397. Appropriate consideration must be given to the "circumstances of the police action, which are often 'tense, uncertain, and rapidly evolving.'" *Groman*, 47 F.3d at 634.

The second prong of the qualified immunity analysis asks whether the constitutional rule which was allegedly violated was "clearly established" at the time of the officer's conduct. The "clearly established" prong of the qualified immunity analysis "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'" *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). The inquiry is "an 'objective (albeit fact-specific) question,' under which '[an officer]'s subjective beliefs . . . are irrelevant.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

"In rare cases, a plaintiff may show that a right is clearly established if the 'violation [is] obvious.'" *Id.*; *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). In "most cases," however, "a plaintiff must show that a right is clearly established because 'the violative nature of *particular conduct* [was] clearly established." *James*, 957 F.3d at 169 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017)) (emphasis in original). In such cases, "settled law" must

"squarely govern[] the specific facts at issue," *id.* (cleaned up), such that the plaintiff must "identify a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the [constitutional provision at issue]." *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *see also James*, 957 F.3d at 169–70. Such settled law may be drawn from "binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'" *James*, 957 F.3d at 170 (quoting *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018)). Thus, the court "first look[s] to factually analogous precedents of the Supreme Court and the Third Circuit" and then "examine[s] persuasive authorities, such as . . . nonprecedential opinions and decisions from other Courts of Appeals." *Id.*

I conclude that Mr. Lankford has not brought forth sufficient evidence to survive summary judgment on his excessive force claim. First, I consider whether Mr. Lankford has established a constitutional claim that Officer Buell used excessive force by striking Mr. Lankford with his baton. As to that issue, I conclude that Mr. Lankford has presented sufficient evidence to create a disputed issue of fact. Second, however, I conclude that striking the suspect with a baton, assuming it occurred, would not violate "clearly established" law with respect to a person who was actively resisting arrest. Third, I reject Mr. Lankford's argument that any use of force by Officer Buell was excessive *per se* because Sergeant Fiorilla had stopped Lankford without probable cause.

### i. Dispute as to whether Buell struck Lankford with a Baton

The use-of-force reports submitted by Officers Velez, Fiorilla, and Alvarez are mutually consistent: Sergeant Fiorilla, the first to arrive at the scene, initiated Mr. Lankford's arrest; then Officer Buell arrived and attempted to gain control of Mr. Lankford's right arm; and then Officers Velez and Alvarez arrived and subdued Lankford by striking his legs with batons.

Mr. Lankford sets out a different version of events which rests on the testimony of Lindsey Fuchs Kennedy, a bystander witness. Ms. Kennedy recalls

that she observed Sergeant Fiorilla force Mr. Lankford to the ground and then remain on top of him for approximately five to ten minutes. (DE 45-4, Deposition of Lindsey Fuchs Kennedy, 3T19:1–3, 20:1–7.) She recalls that then another officer arrived and struck Mr. Lankford's legs with a baton between three and four times. (3T21:11–18.) After that, a third officer arrived and used a baton on Mr. Lankford's legs. (3T23:11–17, 25:12–17.) She described the third officer as "an older police officer," (3T29:6–11), who appeared to be between six feet and six-foot-two in height (3T29:9–24, 3T30:3–6), with blond or gray hair (3T33:7–8.) She described him as taller than the other officers, and stated that he was not "Italian featured" like the other officers. (3T32:20–21; 3T79:18–20.) Plaintiff states that this third officer who struck his legs must have been Officer Buell.

Ms. Kennedy's description does substantially match the description of Officer Buell given by his fellow officers. Sergeant Fiorilla described Buell as approximately six foot one, in his forties or fifties, with short hair, and balding. (DE 45-2, Deposition of Alan Fiorilla, 4T35:6–20, 36:13–14.) Officer Alvarez described Officer Buell as between six two and six three, with gray or balding hair, and approximately forty or forty-five years of age. (DE 45-2 (Exh. E) 5T34:16–22.)[7]

There are bases on which Ms. Kennedy's version of the events could be challenged. An ordinary bystander, she did not know the officers by name. She did not identify the third officer as balding (which, according to his fellow officers, Officer Buell is), and Officer Velez, like Buell, is between six-foot two and three, so it is possible to argue that she conflated the two. (4T38:17–20.) During her cross-examination, Ms. Kennedy admitted that she had given a statement previously which aligned with the police officers' version of the story; that she had an imperfect memory of the details regarding who used force; that she primarily recalled the use of force rather than the appearance of the

---

[7]      Officer Alvarez, in contrast, was described as approximately five-foot five or six, making a mistake unlikely. (4T37:13–14.)

officers who used the force; and that the officers with batons may have arrived nearly simultaneously. (3T72:19–73:19.)

So the question is not whether the police officers struck Lankford with batons; they did. The only question is whether Lankford was struck by Velez and Buell, or by Velez and Alvarez. Velez and Alvarez both admit having done so. If their admissions are correct, then Buell's motion for summary judgment should be granted. The question on summary judgment, however, is not whether the weight of the evidence favors one account or the other. On summary judgment, Mr. Lankford need only meet the low threshold that "evidence exists from which a rational person could conclude" that his version of events "is correct." *Trs. Of the B.A.C. Local 4 Pension Fund v. Demza Masonry, LLC*, 2021 WL 323780 at *3 (D.N.J. Jan. 31, 2021) (quoting *EBC, Inc. v. Clark Bldg. Sys., Inc.* 618 F.3d 253, 262 (3d Cir. 2010)).

Ms. Kennedy's testimony provides such evidence. While a jury could very easily discount her version of events on this narrow issue, it could alternatively credit her testimony and conclude that Officer Buell, not Alvarez, struck Mr. Lankford with a baton. There is a material dispute of fact on this issue.

### ii. Whether Buell's alleged use of the baton constituted excessive force, and whether such a claim was "clearly established"

As explained above, to establish a claim against Officer Buell, Mr. Lankford must prove first, that Buell used force which was excessive by Fourth Amendment standards, and second that it was "clearly established" at the time of the incident that the force was excessive. *Saucier*, 533 U.S. at 201. Even if Officer Buell used a baton to strike Mr. Lankford's legs, I conclude that summary judgment is appropriate because it was not clearly established at the time that this would constitute excessive force under the circumstances.

"To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances." *El v. City of Pittsburgh*, 975 F.3d 327, 336 (3d Cir. 2020) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 182–83 (3d Cir. 2011)). The Court considers "factors including 'the severity of the crime at issue, whether

the suspect[s] pose[] an immediate threat to the safety of the officers or others, and whether [they are] actively resisting arrest or attempting to evade arrest by flight," as well as "the physical injury to the plaintiff, 'the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.'" *Id.* at 336.

For purposes of summary judgment, I now, as I must, take the facts in the light most favorable to the plaintiff. Doing so, I assume the following: Sergeant Fiorilla approached Mr. Lankford without a legitimate basis, and demanded that he produce a driver's license. (Pl.'s SOMF ¶¶ 5–6.) Lankford then responded "what did I do wrong?" repeatedly. (*Id.*) Mr. Lankford put his hands in the air and began to record Sergeant Fiorilla on his cellphone. (*Id.* ¶ 6.) Sergeant Fiorilla then pulled out (but did not discharge) his mace spray and began to grab Mr. Lankford's clothing. (*Id.* ¶ 8.) He slammed Mr. Lankford to the ground and put his knee on Lankford's back. (*Id.*) Lankford placed his hands on his face and kept them there. (*Id.* ¶ 9.) The two then "exchange[d] heated words." (*Id.* ¶ 10.) Sergeant Fiorilla sat on Mr. Lankford's back and repeatedly demanded that Lankford surrender his phone, which Lankford did not do. (*Id.* ¶ 12.)

This standoff continued for approximately ten minutes, during which Mr. Lankford continued to resist Sergeant Fiorilla's commands to give up, i.e., openly display, his hands. (Pl.'s RSOMF Buell ¶ 13.) Officer Alvarez then arrived at the scene, immediately got out of his car, took out a baton, and began to hit Mr. Lankford's legs. (*Id.* ¶ 13.) Officer Buell then arrived and conferred with the other officers. (*Id.* ¶ 16.) Officer Buell then walked over to Mr. Lankford, drew his baton, and struck Mr. Lankford three times on his legs. (*Id.*) At that point plaintiff displayed his hands to the officers. Officer Buell then transported Mr. Lankford to the police station and called him by racial epithets, which included the n–word. (*Id.* ¶¶ 21–22.)

The facts, then, as they relate to Officer Buell,[8] are that he arrived on a scene after the suspect had been detained, to find that the suspect had been resisting arrest for over ten minutes, and had refused to produce his hands to the officers despite repeated commands and even numerous baton strikes. Officer Buell then struck Mr. Lankford three times in the legs. Mr. Lankford was thereby subdued, and Officer Buell stopped using force. When transferring Mr. Lankford to the police station, Buell allegedly used racial epithets. The question is whether, under the law at the time, the force was excessive.

First, I consider whether the force used was reasonable under the circumstances.

Certain of the relevant factors weigh against such a conclusion. For instance, I must consider whether the officer was outnumbered; here, there were initially a single police officer and a single suspect, and the ratio quickly grew to three officers against one suspect. *El*, 975 F.3d at 336. Officer Buell also had little reason to believe Mr. Lankford was violent or posed an immediate threat. When he arrived, Lankford was already on the ground with Sergeant Fiorilla on top of him. Mr. Lankford's resistance was more passive than violent, and the arrival of additional officers would tend to reduce, though not eliminate, the likelihood of more active resistance. It is not clear to what extent Officer Buell would have known about Mr. Lankford's conduct prior to his arrival, although plaintiffs' version of events indicates that Officer Buell conferred with his fellow officers before using his baton.

The severity of the suspected crime is no more than moderate. Legitimate reasons for driving a car with a false license plate are few, and doing so suggests at least an intent to conceal one's identity or to disguise that a car was stolen. Still, the underlying offense does not involve, *e.g.,* violence or dangerous narcotics. For what it is worth, it is unclear from either side's

---

[8] Section 1983 creates liability only to the extent that an officer was personally involved in the conduct which violated the constitution. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

statement of facts whether Officer Buell was aware of the grounds for Sergeant Fiorilla's arrest of Mr. Lankford at all.

Other factors, however, weigh in favor of finding that the use of force was not constitutionally excessive. Mr. Lankford had been actively resisting police efforts to place him under arrest for ten minutes, despite the officers' repeated commands that he surrender. Furthermore, it appeared that application of lesser force had been and likely would continue to be unsuccessful. Sergeant Fiorilla had already been attempting to bring Mr. Lankford into compliance for 10 minutes using his hands, his body weight, and verbal commands. *El*, 975 F.3d at 336. In that situation, the law does not require that the officer sit atop the defendant and hope that he eventually gives up.

The reasonableness of an officer's use of force often presents a factual issue for the jury. *Sanders v. Jersey City*, 2021 WL 1589464 at *7 (D.N.J. Apr. 23, 2021); *see also Rivas v. City of Passaic*, 365 F.3d 181, 199 (3d Cir. 2004). A jury could reasonably conclude that Officer Buell used a reasonable amount of force, striking a resisting suspect only in the legs, with the evident purpose of effecting the arrest, not causing injury. On the other hand, a jury could take into account that Officer Buell resorted to the baton without exhausting less violent means, such as using the combined physical strength of all the officers to pry Lankford's hands from beneath his body. *See Graham*, 490 U.S. at 396 (officers have the right to use some physical force to effect an arrest). Case law suggests that Buell's actions, as alleged, stayed within constitutional bounds. *See infra.* As I say, however, this is ordinarily a fact issue, so I err on the side of ruling that Mr. Lankford has made out a prima facie case of excessive force under applicable constitutional standards.

Moving to the second qualified-immunity issue, however, I find that summary judgment is appropriately entered in Officer Buell's favor on the question of whether the impermissibility of Buell's use of force was "clearly established." The two poles of the analysis are fairly clear: Police may use force, including baton strikes, to subdue a resisting suspect, *Byrd v. Cumberland*

*County*, 2020 WL 3496915 at *11–12 (D.N.J. June 29, 2020); they may not, however, strike a subdued, "handcuffed suspect who is face down and not resisting arrest." *Colon v. City of Paterson*, 2014 WL 4441503 at *3 (D.N.J. Sept. 9, 2014) (police may not use force on individual who has "completely given up resistance").

In *Santini v. Fuentes*, the Third Circuit considered facts similar to these, albeit in a nonprecedential case. 739 F. App'x 718 (3d Cir. 2018). There, a fight broke out between two individuals at a milk farm. *Id.* at 719. Police responded and conducted interviews of a number of farm employees. *Id.* One interviewee was Santini, who had witnessed the fight. *Id.* During the interview, Santini repeatedly put his hands in his pockets. (He said they were cold from milking cows all day.) *Id.* The interviewing officer repeatedly shouted at Santini to keep his hands out of his pockets. *Id.* Santini eventually became frustrated with the officer's shouting and walked away. *Id.* The officer then grabbed Santini's wrist, and the two men fell to the ground, where they wrestled. *Id.* Other officers then intervened, holding Santini's hands behind his back, punching him, beating him with batons, using pepper spray, and demanding that he stop resisting. *Id.* They immediately ceased such measures, however, once Santini was handcuffed. *Id.*

The Third Circuit construed the constitutional question as being whether the police were permitted to beat a non-suspect who walked away from an investigatory discussion, failed to comply with an officer's request to keep his hands visible, and then resisted arrest. *Id.* at 721. The Court concluded that the officers did not use excessive force, because Santini repeatedly failed to comply with the officer's order to keep his hands visible and then resisted arrest; it was at that point that the officers beat him, immediately ceasing when he had been subdued. *Id.*

One might criticize the investigating officer in *Santini* for permitting a mere interview to escalate into a physical struggle. Once the fight began, however, the officers were entitled to subdue the suspect, because he was

20

resisting and because he had refused to produce his hands in response to commands. *Santini* considered it crucial that the officers stopped using force "as soon as Santini was in handcuffs," explaining that on those facts, "there are no cases directly on point that suggest this conduct is unlawful." *Id.* at 721. The court appeared to endorse the use of batons, then, as a means to a legitimate end: *i.e.,* if a suspect is still resisting and has not yet been subdued. *Id. A fortiori,* a reasonable officer in Buell's position could have come to the same conclusion.[9]

Here, Officer Buell used his baton three times on the legs of a resisting suspect. No significant injuries seem to have resulted, and Buell stopped using the baton when the suspect ceased resisting. That use of force is not clearly prohibited by precedent, and indeed appears to fall squarely within the analysis of *Santini*. Though *Santini* is non-precedential, I find it significant that it identified "no cases directly on point" suggesting that the officers' conduct was unlawful. *Id.* at 721.

Similarly, in *Glover v. City of Jersey City*, a district court case, officers believed they had observed the plaintiff engage in a drug transaction and then flee. 2018 WL 6191890 (D.N.J. Nov. 28, 2018). The police pushed the plaintiff against a wall and threw him to the floor. *Id.* at 2. The plaintiff put his hands out to brace himself for the fall, and the officer began to "man handle" him. *Id.* Another officer then arrived and struck the plaintiff with his baton, after which the plaintiff attempted to block his face. *Id.* An officer then twisted the plaintiff's arm behind his back and cuffed him. *Id.* The plaintiff acknowledged that when he "went to the ground to try to protect myself, I guess they thought I was trying to resist or whatever. But I was just trying to stop myself from the fall." *Id.* at 3.

---

[9]     Of course the level of force, even on a resisting suspect, might be excessive if calculated to cause injury beyond what is required to effect the arrest. Here, however, the baton strikes were confined to the suspect's legs and do not seem to have caused any serious injury.

Judge Salas concluded that because the plaintiff had not yet been subdued and did not claim to have been handcuffed or cooperating at the time of the use of force, and because, as the plaintiff admitted, the officers believed he was resisting arrest, it was not clearly established that the officer could not use a baton to subdue him. *Id.* at 6 ("at the time of the arrest in question there was no case law establishing that officers cannot use some force, including briefly using a baton to strike the legs of an arrestee who appears to be resisting, in an attempt to handcuff the suspect before he is fully cooperating with the arrest.").

It might be objected that *Santini* and *Glover,* the most closely analogous cases, date from 2018, two years after Mr. Lankford's 2016 arrest. That objection might be well taken if the issue were whether the *officers* could prove that their actions *were* clearly permitted by then-existing precedent. But the qualified-immunity issue is the opposite: whether the *plaintiff* can establish that a *violation* was clearly established by then-existing precedent. These two cases, though dating from 2018, are relevant to demonstrate that an officer would not have erred, on these facts, in thinking that his conduct was constitutionally permissible; four federal judges, on similar facts, thought so. And in so holding, *Santini* and *Glover* fell in line with well established, pre-2016 precedent that set the ground rules for police use of force. *See Byrd*, 2020 WL 3496915 at *11–12 (use of force against already-subdued suspects is clearly established as violating the constitution, but use of baton against resisting suspect is not clearly established as excessive); *see also Green v. New Jersey State Police*, 246 F. App'x 158, 163 (3d Cir. 2007) (agreeing that "there is no 'case law holding that police officers cannot use force against a subject in an attempt to subdue him'" but holding that when an individual was already handcuffed police could not "hit him on the head twice with a flashlight" or "kick him" on the ground).

Thus far, then, I cannot find that it was clearly established that Officer Buell used excessive force.

We come, then, to the claim of Mr. Lankford that, after the arrest, while driving Lankford to police headquarters, Officer Buell addressed him using vile racial epithets. It must be remembered, however, that this is a claim of excessive force in connection with the arrest. Whatever other issues such post-arrest language might raise, it does not retroactively recalibrate the level of force that was appropriate to effect the arrest. Indeed, even the use of such language *during* an arrest has been held to be irrelevant to an excessive-force claim. *See Thompson v. Howard*, 2015 WL 5039395 at *8 (W.D. Pa. Aug. 26, 2015) (quoting *Hudson v. Goob*, 2009 WL 789924 at *12 (W.D. Pa. Feb. 23, 2009) ("The rule is that if the physical force used is not itself excessive, i.e., is reasonable, then, merely adding verbal threats or racial epithets cannot transform an otherwise non excessive use of force into an unconstitutional use of excessive force.")); *Christian v. Orr*, 2011 WL 710209 at *14 n.51 (E.D. Pa. Mar. 1, 2011) ("[B]ias is not relevant to an excessive force analysis")); *see also Williams v. Sandel*, 433 Fed. Appx. 353, 362 (6th Cir. 2011) ("Nor does Williams's allegation about a racially charged comment transform the officers' force into excessive force."); *Johnson v. City of Ecorse*, 137 F. Supp. 2d 886, 892 (E.D. Mich. 2001); *Thompson v. City of Galveston*, 979 F. Supp. 504, 509 (S.D. Tex. 1997). The reasoning in these cases appears to be that the issue in an excessive force claim is whether the force used was greater than what was justified by the circumstances; whether an officer had a racist motive does not alter the analysis of whether the circumstances justified the amount of force used.

A caveat: In my view, a racial motive might cast doubt on the sincerity of an officer's assessment of the situation as one requiring force. For example, "repeated use of a slur" in the course of an arrest may "bespeak[] a malign motive beyond that of self-defense or reasonable force" and thus might be relevant in a qualified immunity analysis. *See Sanders*, 2021 WL 1589464 at *8. In *Sanders*, however, the question was whether an officer reasonably interpreted the plaintiff's arm movement as threatening; his use of a slur

indicated that the officer might have been untruthful, or at least biased in his perception, about perceiving the plaintiff's arm movement as a threat.

That, however, is not this case. No one disagrees that Mr. Lankford was physically resisting arrest, and no one disputes that Officer Buell accurately perceived that Lankford was doing so. As to an excessive force claim—and again, that is the claim here—Buell's alleged expressions of racial bias are not relevant to the analysis of whether striking Mr. Lankford's leg with the baton exceeded the constitutional bounds of appropriateness in subduing a resisting arrestee.

### iii.    Excessive force and lack of probable cause

Mr. Lankford asserts that Officer Buell's use of force was excessive *per se*, because there was no probable-cause basis for his arrest. Lankford claims the officers arrested him without probable cause, for reasons of racial bias, so that *any* amount of force used to effectuate his unlawful arrest was excessive by definition. While the theory has some surface attractiveness, it has been rejected, in order to preserve the distinction between a claim of excessive force and one of false arrest, which does not have undue force as an element.[10] No constitutional excessive force claim, let alone a clearly established one, flows from the lack of probable cause as such.

There is good support for Mr. Lankford's theory that his arrest lacked probable cause. Indeed, the criminal case against Mr. Lankford was dismissed by Judge Abdelhadi of Paterson Municipal Court for lack of probable cause. In dismissing the criminal case, Judge Abdelhadi rejected Sergeant Fiorilla's explanation of how he came to suspect that Mr. Lankford's license plate was fake, noting that Fiorilla claimed to have noticed that the license plate had an unusual font, while driving at 30 miles per hour in the opposite direction of Lankford's car, which was third in line behind other cars at a stop light. The

---

[10]    The false arrest claim is discussed below. As to that claim, Officer Buell's motion for summary judgment is denied.

state judge also shrewdly noted that the police never produced the license plate, or a photo of it, to show that it bore an unusual font.

Because it was not necessary to the dismissal decision, Judge Abdelhadi did not explicitly endorse Mr. Lankford's alternative explanation for the stop, *i.e.,* that he was an African-American man driving a Mercedes. Neither, however, did the Judge reject the possibility of bias. (*See* Tr. of Probable Cause Hearing, Paterson Municipal Court, 1T8:7–8, 9:22–10:3 (stating that he did "not want to make that leap and make a finding as to why in fact the officer stopped this particular defendant" but finding inconsistencies in Sergeant Fiorilla's testimony "very troubling" and "not that credible").)

Judge Abdelhadi's decision is not binding here. *See Murphy v. Bendig*, 232 Fed. Appx. 150, 152 (3d Cir. 2007) (in a federal § 1983 case, the issue of probable cause is not collaterally estopped by criminal court's prior decision) (citing *Smith v. Holtz*, 210 F.3d 186, 199 n.18 (3d Cir. 2000)). I do, however, find Judge Abdelhadi's reasoning persuasive as a plausible, well-reasoned evaluation of the facts. Like Judge Abdelhadi, a jury could conclude that the stop in this case lacked probable cause, whether or not resulting from racial bias.

To repeat, on a motion for summary judgment I must construe disputed facts in Mr. Lankford's favor. But to repeat further, the claim I am now analyzing is one of excessive force, not false arrest. Contrary to Mr. Lankford's assertions, the absence of probable cause does not establish a *per se* excessive force claim.

"In a case where police effect an arrest without probable cause . . . but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force." *Holmes v. City of Wilmington*, 79 F. Supp. 3d 497, 506 (D. Del. 2015) (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007)). "A claim for excessive force, which is merely a concomitant to a contested arrest but is not based on some

actual allegation of unreasonable force, must be dismissed." *Id.* (citing *Van Brackle v. Pa. Parole Bd.*, 1996 U.S. Dist. LEXIS 13998, 1996 WL 544229 at *3 (E.D. Pa. Sept. 26, 1996)).

Indeed, the Third Circuit has repeatedly "rejected similar efforts to bootstrap excessive force claims and probable cause challenges" and thus refused to apply a rule which holds that "force applied was excessive *per se* because the initial arrest was illegal." *Snell v. City of York*, 564 F.3d 659, 672 (3d Cir. 2009); *see also Bodine v. Warwick*, 72 F.3d 393, 400 & n.10 (3d Cir. 1995) ("merely because a person has been falsely arrested does not mean that excessive force has been used").

Thus, Mr. Lankford cannot prove excessive force merely by showing that the officers lacked probable cause. He must instead show that the police actually used force beyond what would be appropriate to effectuate an arrest.

For the reasons stated above, summary judgment is granted in Officer Buell's favor on the excessive force claim, on qualified immunity grounds.

### 2. Civil Conspiracy

Mr. Lankford brings a claim of civil conspiracy pursuant to Section 1983.

The elements of a conspiracy are that two or more persons conspire to deprive a person of constitutional rights, one or more of the conspirators performs any overt act in furtherance of the conspiracy, and the overt act injures the plaintiff or deprives him of any rights or privileges of a citizen of the United States while the conspirators acted under color of state law. *Barnes Foundation v. Twp. of Lower Merion*, 22 F.3d 151 (3d Cir. 2001).[11] To prove such a claim, a plaintiff must show the existence of a conspiracy and a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. *Jackson-Gilmore v. Dixon*, 2005 WL 3110991 (E.D. Pa. Nov. 17,

---

[11] To the extent that Mr. Lankford asserts a civil conspiracy under New Jersey state law, the elements are essentially the same, so his state claim stands or falls with the federal-law analysis in this section. *Banco Popular N.A. v. Gandi*, 184 N.J. 161 (N.J. 2005) (civil conspiracy requires agreement between parties to inflict wrong against or injury upon another and an overt act which results in damages).

2005). The plaintiff must establish the period of the conspiracy, the object of the conspiracy, and certain overt acts of the alleged conspirators taken to achieve that purpose. *Hankin Family P'Ship v. Upper Merion Twp.*, 2012 WL 43599 (E.D. Pa. Jan. 6, 2012).

The parties dispute whether Mr. Lankford has adduced sufficient evidence in support of his claim of a conspiracy. To establish a conspiracy, Lankford points to two pieces of evidence: (1) Officer Buell spoke with Officers Alvarez and Fiorilla when he arrived on the scene, and (2) the officers submitted use-of-force reports which were in conflict with the testimony of Lindsey Fuchs Kennedy.

"The mere occurrence of several meetings between [defendants does] not establish a meeting of the minds" for purposes of a conspiracy claim. *Jones v. Dalton*, 867 F. Supp. 2d 572, 585 (D.N.J. 2012). *See Fiorigilio v. City of Atlantic City*, 996 F. Supp. 379, 387–88 (D.N.J. 1998) (rejecting claim of conspiracy based on meetings between defendants where "plaintiff admits he has no personal knowledge about what the defendants talked about during the alleged meeting" and "has absolutely no evidence suggesting that defendants set out to retaliate against him"). Thus, a jury may not reasonably infer from the mere fact that individuals met that they reached a conspiratorial agreement. *Id.* Mr. Lankford's claim that there was a conspiracy because Officer Buell and Officer Alvarez spoke to one another, then, rests on "speculation and conjecture," *id.* at 389, and would not permit a jury finding of conspiracy.

To suggest that the officers conspired, Mr. Lankford also points to an inconsistency: In Ms. Kennedy's account, Officer Buell was the second officer who used his baton on Mr. Lankford's legs, but the three officers' use-of-force reports all state that the second officer was Velez. That inconsistency, says Lankford, is evidence of a conspiracy among the officers to conceal the true facts.

That use-of-force reports conflict with other evidence may, in some contexts, support an inference of conspiracy. In *Ewing v. Cumberland County*, a

district court found it likely that five corrections officers had engaged in a conspiracy because their use-of-force reports all downplayed the amount of force they used, contrary to objective evidence in the record that they had given the plaintiff a severe beating. 152 F. Supp. 3d 269, 301 (D.N.J. 2015). But the *Ewing* court found other corroborating evidence, such as the testimony of a nurse in the correctional facility that one of the officers told her that she "knew what to say" if people began to ask questions, and the "nearly identical" language in the use-of-force reports, including (in four of five) "the same misspelling of the word 'irate.'" 152 F. Supp. 3d at 301. Mr. Lankford points to no comparable corroborating evidence here. While the three officers' descriptions of their conduct are generally consistent, Mr. Lankford points to no indicia of a cooperative fabrication.

In any event, the conspiracy scenario makes little sense. Mr. Lankford alleges that the use-of-force reports falsely shift responsibility for the baton strikes from Officer Buell to Officer Velez. The claim, then, is that these officers admitted that three of them participated in the use of force, simply swapping the identities of one of the participants. If this is a conspiracy to cover up the facts, it is a strangely limited one. Indeed, the conspiracy would only plausibly succeed if the innocent Officer Velez went along with it and agreed to accept the blame; yet Mr. Lankford claims that the agreement occurred when Buell arrived and spoke with the other officers, well before Officer Velez even arrived.

None of this is to say that police officers could *never* agree to shift blame among themselves, rather than exculpate themselves. For example, they might, in solidarity, decide to spare an officer who already had numerous complaints against him or might be subject to more severe disciplinary action for some reason. Nothing in this record, however, suggests any such possible motive with respect to Officer Buell. From this record, the only identifiable distinction between Velez and Buell is that Officer Buell, after the arrest, allegedly used a racial slur to insult Mr. Lankford; one could theorize that the officers sought to distance their actions from any such racial motive. But this theory, too, does not fit the facts: the agreement to enter the conspiracy allegedly occurred when

Officer Buell spoke with Officer Alvarez at the scene, well before he uttered any slur. Plaintiff simply has not brought forth sufficient facts to raise a factual issue as to whether a conspiracy occurred.

At this late stage, on summary judgment, Mr. Lankford is required to offer more than insinuations; he must, through citations to evidence of record, set forth a prima facie case of civil conspiracy. Because he has failed to do that, I **GRANT** Officer Buell's summary judgment motion on the civil conspiracy claim.

### 3. Remaining Section 1983 Claims

Mr. Lankford also appears to be asserting claims for false arrest, false imprisonment, deprivation of property without due process, and a Taking of property without just compensation, pursuant to Section 1983.[12]

#### a. False arrest/imprisonment

Mr. Lankford points to sufficient evidence to create a dispute as to whether he suffered a false arrest and/or false imprisonment. "The proper inquiry in a section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Groman*, 47 F.3d at 634 (quoting *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)). "[W]here the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." *Id.* at 636 (citing *Thomas v. Kippermann*, 846 F.2d 1009, 1011 (5th Cir. 1988)).

Mr. Lankford has brought forth sufficient evidence to create a dispute of fact as to whether there was probable cause for his arrest and subsequent

---

[12]    As noted above, Mr. Lankford's complaint is quite confusing as to what claims he is truly pursuing. The false arrest and false imprisonment claims, however, appear in the same paragraph, and in the same context, as Mr. Lankford's civil conspiracy claim. He also argues affirmatively, in connection with the excessive force claims, that the officer lacked probable cause for his arrest. I will therefore find that he has, however unclearly, expressed an intent to assert a § 1983 claim of false arrest or imprisonment.

detention. (*See* Section A.1.iii, *supra*.) Moreover, Officer Buell does not appear to address false arrest/imprisonment in his motion for summary judgment. To the extent Buell intended to do so, however, summary judgment is **DENIED** as to § 1983 claims of false arrest and false imprisonment.

### b. Property deprivation and per quod claims

I turn to Mr. Lankford's claims of deprivation of property and Takings under Section 1983, and his claims of conversion and loss of companionship under New Jersey tort law. The summary judgment motion understandably does not address these claims, which are barely asserted. I have reviewed the factual submissions and found no evidentiary basis for them. In the interest of streamlining this case for trial, I give notice that I am considering granting summary judgment in Officer Buell's favor on these claims *sua sponte,* subject to any supplemental submission a party wishes to make within 10 days. *See Gibson v. Mayor and Council of City of Wilmington*, 355 F.3d 215, 222 (3d Cir. 2004).

## B. Whether the NJTCA's Immunities Protect Officer Buell Against the State Law Claims

As mentioned *supra*, I interpret the Complaint as asserting certain New Jersey tort law claims against Officer Buell. Buell counters that he is protected by certain immunities set forth in the New Jersey Tort Claims Act. I disagree.

### 1. Good Faith Immunity

Under N.J.S.A. 59:3-3, "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment." "Good faith" under that statute means either "objective reasonableness" or "subjective good faith." *Hayes v. Mercer County*, 217 N.J. Super. 614, 622 (App. Div. 1987); *see also Alston v. City of Camden*, 168 N.J. 170, 178 (N.J. 2001). This is a disjunctive analysis: an employee may be immune under either test, and need not satisfy both. *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 582–83 (N.J. 2009); *Alston v. City of Camden*, 168 N.J. 170, 186 (N.J. 2001).

Under the objective reasonableness test, courts "appl[y] the same standards of objective reasonableness that are used in federal civil rights cases," namely, qualified immunity under 42 U.S.C. § 1983. *N.E. v. J.V. v. DYFS*, 449 N.J. Super. 379, 404 (App. Div. 2017); *see also Wildoner v. Borough of Ramsey*, 162 N.J. 375, 387 (N.J. 2000).

I have already concluded that Officer Buell is entitled to qualified immunity under Section 1983 on the excessive force and civil conspiracy claims. Parallel state tort law claims arising from the same conduct would ordinarily give rise to good faith immunity as well. *See Ianuale v. Borough of Keyport*, 2018 WL 5005005 at *12 (D.N.J. Oct. 16, 2018) ("Because Plaintiffs' New Jersey state common law assault and battery, malicious prosecution, invasion of privacy, and abuse of process tort claims arise from the same alleged conduct as Plaintiff's § 1983 claims, the NJTCA's good faith immunity provision applies to bar Plaintiff's tort claims against Officer Defendants."); *see also Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 445 (D.N.J. 2011) ("Therefore, if the alleged tort and alleged constitutional violation arise out of the same conduct, and the Court concludes that no constitutional violation occurred because the public employee's actions were objectively reasonable, the NJTCA's good faith provision applies and bars prosecution of the tort claim."). This immunity would apply to Mr. Lankford's assault and civil conspiracy claims because they closely parallel his Section 1983 claims. It would also encompass Mr. Lankford's negligence claims and his loss-of-companionship claim to the extent they concern Officer Buell's use of force.

The N.J.S.A. § 59:3-3 immunity, however, is not complete; it is "qualified." As relevant here, under N.J.S.A. § 59:3-14(a), the immunity does not extend to a state employee's conduct which constitutes a "crime, actual fraud, actual malice, or willful misconduct." *See Leang*, 198 N.J. at 582–83, 586 ("we agree . . . that the 'actual malice' standard applies and, if plaintiff can meet it, that proof would make the immunity protection inapplicable'"). To the extent a jury could find malice, the good faith immunity would not apply.

"To pierce section 3-3's qualified immunity, a plaintiff must prove more than ordinary negligence." *Canico v. Hurtado*, 144 N.J. 361, 365 (N.J. 1996). If the immunity is pierced, however, a plaintiff may bring negligence claims against a public employee. As the New Jersey Appellate Division explained in *Dunlea v. Belleville*, "The New Jersey act . . . provides immunity to public employees engaged in law enforcement notwithstanding their negligence, *so long as they act in 'good faith.'*" 349 N.J. Super. 506, 511 (App. Div. 2002) (emphasis added) (quoting *Marley*, 193 N.J. Super. at 294–95); *see also Tice v. Cramer*, 254 N.J. Super. 641, 649 (App. Div. 1992) ("The 'initial inquiry is whether any immunity applies,' and if not, should liability attach."). Thus, if there remains a factual issue as to whether Officer Buell acted in good faith, those claims are not barred from the jury's consideration.

I find there is evidence in the record that Officer Buell acted with "actual malice," and thus lacked good faith, because he is alleged to have addressed Mr. Lankford using a racial slur. "In the context of alleged use of excessive force, the [New Jersey Supreme] Court has suggested that it can be attributed to 'actual malice' or 'willful misconduct' when it 'involv[es] deliberate and totally outrageous behavior.'" *In re Rodriguez*, 423 N.J. Super. 440, 452 (App. Div. 2011) (quoting *Moya v. City of New Brunswick*, 90 N.J. 491, 504 n.8 (N.J. 1982)). The *Rodriguez* court found the "actual malice" standard in the New Jersey Tort Claims Act largely tracked that of the term as used in the punitive damages statute, which requires "an intentional wrongdoing in the sense of an evil-minded act." *Id.* (quoting N.J.S.A. 2A:15-5.10).[13]

"Racial discrimination . . . is, in and of itself, outrageous conduct, an expression of malice." *Johnson v. Ryder Truck Rentals, Inc.*, 264 N.J. Super. 312, 317 (Law Div. 1993); *Timber Properties, Inc. v. Chester Twp.*, 205 N.J. Super. 273, 286 (Law Div. 1984) (actual malice can be proven where the

---

[13]     To be clear, the use of racial epithets would not be relevant to the issue of whether the force used was excessive, as established above. It could, however, be relevant to the issue of malice.

individual undertook an action solely to harm the plaintiff). Officer Buell's use of the racial slur—assuming, as I must for purposes of this motion, that it occurred— would indicate that he bears ill will towards individuals of Mr. Lankford's race and could support an inference that he sought to harm Lankford on that basis, negating good faith. Furthermore, the use of a slur such as the n–word would be outrageous and completely contrary to a police officer's proper role. I thus cannot grant summary judgment, because issues of fact bar a finding that the good faith immunity protects Officer Buell's conduct.

The good faith immunity, furthermore, does not apply to claims of intentional false arrest/ imprisonment, or intentional infliction of emotional distress. N.J.S.A. 59:3-3 ("Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."); *see also Gattas v. City of Jersey City*, 2010 WL 892187 at *7 (D.N.J. Mar. 5, 2010) (good faith immunity inapplicable to intentional infliction of emotional distress). Thus, those particular claims would survive the application of good faith immunity to Officer Buell's conduct, regardless of whether he displayed actual malice.

I thus turn to Officer Buell's second defense, which is based on the NJTCA's verbal threshold.

### 2. The NJTCA's "Verbal Threshold"

The Tort Claims Act contains a so-called "verbal threshold" provision which limits claims for pain-and-suffering damages. That provision is N.J.S.A. 59:9-2(d):

> No damages shall be awarded against a public entity or public
> employee for pain and suffering resulting from any injury;
> provided, however, that this limitation on the recovery of damages
> for pain and suffering shall not apply in cases of permanent loss of
> bodily function, permanent disfigurement or dismemberment
> where the medical treatment expenses are in excess of $3,600.00.

The point of this provision is to "weed out claims for 'subjectively measured damages for pain and suffering, which are not compensable by the Tort Claims Act.'" *Nieves v. Officer of the Public Defender*, 241 N.J. 567, 580 (N.J. 2020). That exception does not apply to "willful or other outrageous misconduct

excepted under N.J.S.A. 59:3-14." *Id.*; *see also Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 584 (N.J. 2009).

As discussed above, Mr. Lankford has provided sufficient evidence for a jury to conclude that Officer Buell engaged in "willful or other outrageous misconduct" by demonstrating "actual malice" via his alleged use of racial slurs against Mr. Lankford. N.J.S.A. 59:3-14. If a jury were to find that Buell did engage in such conduct and that it demonstrates actual malice, the verbal threshold would not apply. Summary judgment is therefore not appropriate.

## C. Assault

Officer Buell moves for summary judgment against Mr. Lankford's state law tort claim of assault. The parties agree that "[p]olice officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force." *Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (citing *Edwards v. City of Phila.*, 860 F.2d 568, 572 (3d Cir. 1988)). Mr. Lankford claims Officer Buell was not privileged to assault him in this case because the arrest Officer Buell was helping effectuate was not "lawful"; as explained above, Mr. Lankford claims Sergeant Fiorilla stopped him for reasons of racial bias and lacked probable cause.

Case law is sparse as to whether an absence of probable cause renders an arrest "unlawful" such that police officers are no longer privileged to commit battery. New Jersey courts appear not to have reached the issue directly. *But see Zalewski v. Gallagher*, 150 N.J. Super. 360, 371 (App. Div. 1977) ("This jury specifically found that Gallagher had used excessive force in arresting Leslie and in overcoming Leslie's resistance to that arrest. He had committed an assault and battery . . . ."). New York state law, on the other hand, holds that "[i]f an arrest is determined to be unlawful [because it lacks probable cause], any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest." *Sulkowska v. City of New York*, 129 F. Supp. 2d 274, 295 (S.D.N.Y. 2001). Third Circuit precedents, particularly *Groman* and

*Edwards,* go no farther than to hold that excessive force removes an officer's privilege to commit battery or assault, without reaching the probable cause issue. And courts have not found that the absence of probable cause makes out a *per se* claim of excessive force, *see* Section III.A.1.i, *supra*; *see also Snell*, 564 F.3d at 672–73.

Perhaps the most straightforward approach is set out in the Restatement (Second) of Torts § 118. The Restatement states that "[t]he use of force against another for the purpose of effecting his arrest and the arrest thereby effected are privileged if all the conditions stated in §§ 119–132, in so far as they are applicable, exist." In Comment a., the Restatement (Second) makes clear that "this Subject does not consider the question whether the arrest is made under such circumstances as to . . . render invalid the judicial proceedings in the course of which the arrest is made." That is, the probable cause inquiry and the assault/ battery inquiries are separate from one another.

Restatement (Second) §§ 121 clarifies that a peace officer may make an arrest where he or she "reasonably suspects" that an individual has committed a felony, a breach of the peace, or an "affray."[14] *See also id.* §§ 119–20. Under this approach, the question would be whether Officer Buell, upon arriving at the scene, believed that Mr. Lankford was committing a crime, breaching the peace, or committing an affray. This approach differs from Mr. Lankford's proposal in that it does not depend on whether Officer Buell's reasonable determination resulted from an unlawful initial arrest by Sergeant Fiorilla.

The Restatement (Second) approach seems like a reasonable middle ground between the New York approach and one which immunizes officers from liability for assaults regardless of whether the officer actually believed a crime has been committed. The New York approach seems likely to create tort liability out of reasonable mistakes—for example, where an officer arrested an

---

[14] "The fighting of two or more persons in some public place to the terror of the people. Black's Law Dictionary, *What is AFFRAY?*, https://thelawdictionary.org/affray/.

individual based on what appeared to be probable cause but was later determined to be the fruit of the poisonous tree. To extend immunity without any regard to the legitimacy of the detention, on the other hand, seems to incentivize lawlessness. I believe the New Jersey Supreme Court would adopt the Restatement (Second) approach, so I apply it here.

Here, Officer Buell came upon Mr. Lankford resisting Sergeant Fiorilla's orders to produce his hands for an extended period of time. He could reasonably have gone to his fellow officer's aid without first conducting an on-the-spot interview regarding probable cause. He could reasonably have concluded that Mr. Lankford was committing the crime of resisting arrest or an affray. His efforts to subdue Mr. Lankford, therefore, were privileged under the Restatement test, and do not constitute assault and battery.

### D. Negligent and Intentional Infliction of Emotional Distress

Mr. Lankford has set forth a prima facie case of intentional infliction of emotional distress. To prevail on such a claim, he must establish that Officer Buell's conduct (1) was extreme and outrageous, (2) was intentional or reckless, (3) caused emotional distress, and (4) that distress was severe. *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir. 1979); *see also Buckley v. Trenton Saving Fund Society*, 111 N.J. 355, 366–67 (N.J. 1988).

For conduct to be "extreme and outrageous," New Jersey courts require that the conduct have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Ingraham v. Ortho-McNeil Pharmaceutical*, 422 N.J. Super. 12, 21 (App. Div. 2011). Courts refer to it as an "elevated threshold" which is "satisfied only in extreme cases." *Id.* (quoting *Griffin v. Tops Appliance City, Inc.*, 337 N.J. Super. 15, 23 (App. Div. 2001)).

Here, Officer Buell allegedly engaged in two "outrageous" acts: first, he used his baton to strike Mr. Lankford's leg three times, and second, he used

various racial slurs, including the n–word, against Mr. Lankford. I find that only the second is potentially regarded as "extreme and outrageous."

As discussed, Officer Buell's use of his baton did not violate clearly established law concerning use of force on resisting suspects. The Officer could reasonably have determined that Mr. Lankford had been resisting arrest for over 10 minutes despite numerous efforts by two other officers to bring him under control. In such a circumstance, an officer "is privileged to commit a battery." *Groman*, 47 F.3d at 634. At any rate, the baton strikes would not have been so lacking in justification as to rise to the level of outrageousness.

Plaintiff argues that Officer Buell was not privileged to commit a battery in this instance because the arrest was unlawful, because the officers lacked probable cause.[15] But even if that were true, Officer Buell could have reasonably believed that his use of force was privileged in these circumstances, as there is no evidence in the record to indicate that he was aware of Sergeant Fiorilla's motive for arresting Mr. Lankford. Furthermore, all parties agree that Mr. Lankford had been resisting arrest for over ten minutes. Officer Buell thus appears to have done nothing more than simply use force to subdue a resisting arrestee. Striking a suspect in the legs is not outrageous or disproportionate in that context. The use of force by a police officer under such circumstances is, as a matter of law, not "so outrageous in character" or "extreme in degree" as to justify sending a claim of intentional infliction of emotional distress to a jury.

In contrast, it is well established in New Jersey that the direct use of "an atrocious racial slur to refer to an African-American" by an individual in authority meets the "elevated threshold" required to make this an "extreme case." *Ingraham*, 422 N.J. Super. at 21 (discussing *Taylor v. Metzger*, 152 N.J. 490, 508–21 (N.J. 1998)). In *Metzger*, a county sheriff's officer was called a racial slur by her boss, the county sheriff. *Id.* at 494–95. The New Jersey

---

[15] As discussed, New Jersey law is inconclusive on this issue but the best approach seems to be to ask whether Officer Buell reasonably believed a crime or breach of the peace was occurring rather than engaging in a probable cause inquiry.

Supreme Court concluded that "[a] racial slur uttered by a sheriff directed against a subordinate officer is not, as a matter of law, a mere insult or triviality. A reasonable jury could reasonably conclude that defendant's conduct was atrocious and intolerable." *Id.* at 509–10. The court concluded that the use of the slur "stepped beyond our civilized community's bounds of decency" and so "[a] jury should determine whether defendant's remark was outrageous or merely an insult." *Id.* at 510.

*Metzger* "d[id] not hold that a single racial slur spoken by a stranger on the street could amount to extreme and outrageous conduct"; the plus factor in that case consisted of "the power dynamics of the workplace." *Id.* at 511. By the same reasoning, the use of racial slurs by an arresting officer, who represents the government and is empowered with significant discretion in enforcing the law, could rise to the level of outrageousness. Such an insult, in such a context, could reasonably be found to have a significant impact on the psyche of an individual, who might infer that he was seen as less than a full citizen in the eyes of the law.

So not every insult, even a racial one, is actionable; what transforms this particular insult is the power dynamic, one involving a suspect in the absolute control of the police. *See Wigginton v. Servidio*, 324 N.J. Super. 114, 131 (App. Div. 1999) (a tortfeasor's "position of authority and power" over a plaintiff may contribute to a finding of extreme and outrageous conduct). Officer Buell was not a mere passerby who used a racial slur against Mr. Lankford. He was a police officer, representing the government and is empowered with enforcing our society's laws. He said the slurs not in passing, but immediately after Mr. Lankford had received a beating (whether justified or not) from the police. Buell allegedly uttered the slurs while Lankford was in his physical control, in the course of telling Mr. Lankford that he could never win a case against Clifton. The effect of such language, at least in Mr. Lankford's version of the events, was not only to insult Lankford on the basis of his race, but to send a message:

that he was beaten on account of his race, and that because of his race he would never be able to obtain redress.[16]

The use of racial slurs by a police officer immediately after a suspect was subdued by force, in the context of a questionable arrest and statements that the suspect would never receive justice, is outrageous and shocking. On an interpretation of the facts most favorable to Lankford, it could constitute intentional infliction of emotional distress.

I also find the evidence sufficient to satisfy the requirement that such distress be severe. *Metzger*, 152 N.J. at 515; *Buckley*, 111 N.J. at 366–67. "Severe emotional distress is a severe and disabling emotional or mental condition which may be generally recognized and diagnosed by trained professionals." *Turner v. Wong*, 363 N.J. Super. 186, 200 (App. Div. 2003) (citing *Metzger*, 152 N.J. at 515). The "emotional distress must be sufficiently substantial to result in either physical illness or serious psychological sequelae." *Id.* (citing *Aly v. Garcia*, 333 N.J. Super. 195, 204 (App. Div. 2000)). "Whenever an intentional infliction of emotional distress claim arises out of conduct that also constitutes invidious discrimination on the basis of 'race' . . . the average person standard must be adopted to reflect those characteristics of the plaintiff that are the focus of the alleged discrimination." *Id.* (quoting *Metzger*, 152 N.J. at 516–17).

"[A]ggravation, embarrassment, an unspecific number of headaches, and the loss of sleep" is not sufficient distress as a matter of law to be "severe." *Buckley v. Trenton Sav. Fund Soc.*, 111 N.J. 355, 366 (N.J. 1988); *see also*

---

[16]     In his deposition, Lankford described it this way:

> I know when I was arrest[ed], they were saying a bunch of racial things, so that basically comes from how I felt anyway. You know, I mean, they shouldn't be calling me out my name anyway, you know . . . . when we got to the precinct, when we got to the precinct and I was in the back, I was talking to him too. I'm just like, you want to pay for this. He called me a [n–word] and everything. So like how am I supposed to feel about that? . . . . He basically was saying, I got fuckin' lawyers too. He said you'll never win his case.

(2T119:19–120:9).

*J.L.D. v. Estate of Gannon*, 2016 WL 8677315 at *24 (D.N.J. July 29, 2016) ("anxiety, sleep loss, lack of trust, damaged relationships, tinnitus, headaches, and the like" are insufficient to prove severe damages). Nor are a plaintiff's bare statements that he was "distressed, anguished, humiliated, and troubled." *Gattas*, 2010 WL 892187 at *8. On the other hand, where a plaintiff "lived in fear that propelled her to purchase a bullet-proof vest," received treatment for anxiety, underwent psychotherapy for as long as she could afford to do so, suffered from mood changes, insomnia, nightmares, and flashbacks, and was ultimately diagnosed with PSTD, she established severe emotional distress. *Metzger*, 152 N.J. at 514.

Whether a plaintiff ever sought medical attention is relevant to the severity of emotional distress. *Fleming v. United Parcel Services, Inc.*, 255 N.J. Super. 108, 166 (Law Div. 1992). Evidence of such treatment, or expert testimony suggesting severe emotional trauma, however, is not "necessary for a plaintiff to prevail on an IIED claim." *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 532 (D.N.J. 2008) (citing *Bolden v. SEPTA*, 21 F.3d 29, 34 (3d Cir. 1994)); *see also Esposito v. Little Egg Harbor Twp.*, 2012 WL 1495468 at *7 (D.N.J. Apr. 27, 2012) (plaintiff's claim did not fail for lack of medical evidence, but rather lack of any evidence from which a reasonable jury could find severe emotional distress). Rather, expert testimony is only required when "the matter to be dealt with is so esoteric that jurors of common knowledge and experience cannot form a valid judgment." *Butler v. Acme Markets, Inc.*, 89 N.J. 270, 283 (N.J. 1982).

In his deposition Mr. Lankford describes his emotional injuries as relating to his fear of arbitrary arrest or physical beatings at the hands of the police because of his race. He explained that he is now afraid of police and "If I can avoid them, I will avoid them. If I was to get stopped today, even in an Uber, I'd panic. I wouldn't know what to do. I would think he would just going to fuck with me for no reason. I wouldn't know how to react to that type of situation, so I just try to stay away from them." (DE 45-3, Deposition of

Laquice Lankford, 2T154:1–6 (emphasis added).) He further explained that he felt "[m]istreated, singled out, just treated inhumane, man, like, just crazy." (2T154:10–11.) He explained that when he is pulled over, he will "panic. I don't know if I want to tell them the truth. I don't know if I want to run. I don't even, -- I don't know what's going to happen at that point," and he explains that feels "like if I made the wrong move, like it was going to go south for me, basically." (2T128:9–17, 130:3–5.) He explains that his experience left him "terrified of cops now" and that the experience "left [him] shooken up." (2T130:11–14.) Lastly, he explains that during the beating he "was just thinking, like, I might not even make it out this situation. I was just like, I fucked up this this time. Like, I thought about my kids. I thought about, you know, my loved ones. I just thought — I felt like I was going to die. I'm like a blow to the head is about to come. I just thought — I couldn't believe they was doing this to me. I'm a grown man. I couldn't believe I was getting beat like that." (2T153:8–15.) Mr. Lankford explained that he did not seek medical treatment for his feelings of panic and stress, but only because he could not afford it. (2T128:23–129:6.)

Mr. Lankford's feelings of panic and fear in the presence of police are sufficient to send the issue of "severe emotional distress" to the jury. Lankford has not simply alleged in a conclusory fashion that he has "sustained severe emotional distress," *Esposito*, 2012 WL 1495468 at *7, or merely claimed to be anxious and to have headaches, *J.L.D.*, 2016 WL 8677315 at *24. He describes "severe psychological sequelae" such as panic, terror, changing his behavior to avoid the police, and feeling as though it is possible that he would be killed if he is pulled over in the future. *Turner*, 363 N.J. Super. at 200. A jury could reasonably find severe emotional distress on these facts.

The element of proximate cause is also satisfied by this evidence. True, the most obvious and direct cause of Mr. Lankford's distress would be his physical treatment, rather than the verbal slurs he heard afterwards. But the slurs could have amplified the emotional effect of the physical beating by implying that, because of his race, he would just have to take it, now and in

the future. A jury could conclude otherwise, but it could reasonably find in Mr. Lankford's favor on those facts.

For the same reason, I do not dismiss Mr. Lankford's claim of negligent infliction of emotional distress. Officer Buell asserts that this claim fails because Mr. Lankford has not suffered severe emotional distress, has not provided expert witnesses in support of this claim, has not claimed that Officer Lankford violated any police duty, and did not proximately cause his injuries. All of these arguments fail for the reasons explained *supra*.

### E. Punitive Damages

I cannot, on summary judgment, rule out punitive damages for the Section 1983 claims of false arrest/imprisonment and the remaining state law claims.

Punitive damages are available in Section 1983 claims where the plaintiff can show a "malicious intention to deprive respondents of their rights or to do them other injury." *Carey v. Piphus*, 435 U.S. 247, 257 n.11 (1978); *see also Smith v. Wade*, 461 U.S. 30, 56 (1983). Here, Officer Buell's use of a racial slur, if accepted by a jury, could support an inference of malicious intent to deprive Mr. Lankford of his constitutional rights. *Ryder Truck Rentals, Inc.*, 264 N.J. Super. at 317 ("racial discrimination fits well within the parameters established by the New Jersey courts which set forth the circumstances that warrant punitive damages").

As for the state law claims, in New Jersey a plaintiff must prove "by clear and convincing evidence" that the harm suffered by the plaintiff was "actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J.S.A. 2A:15-5.12(a). I find, given Officer Buell's use of a racial slur, that there is evidence that he had actual malice towards Mr. Lankford.

Whether punitive damages can be established is of course an open question. The state of the evidence, however, indicates that plaintiff may be able to carry his burden, so summary judgment is not appropriate.

### F. Conclusion: Officer Buell

The plaintiff and Officer Buell have proffered clashing versions and interpretations of the facts. The Court's task on summary judgment is not to resolve disputed issues but to determine whether, giving the facts the interpretation most favorable to the plaintiff, there is an issue for the jury. I **GRANT** the motion for summary judgment against Mr. Lankford's claims for excessive force and civil conspiracy pursuant to Section 1983 and against his claims for assault and civil conspiracy[17] under New Jersey law. Otherwise, however, Officer Buell's motion is **DENIED**.

## IV.    **CLIFTON'S MOTION FOR SUMMARY JUDGMENT**

Mr. Lankford brings claims against Clifton (1) based on Section 1983 for deliberate indifference in failing to adequately train or supervise the officers involved in Mr. Lankford's arrest and beating, pursuant to a custom or practice of racialized policing; and (2) for negligent supervision under New Jersey state law. I **GRANT** summary judgment to Clifton on both of these claims.

### A. Section 1983 *Monell* Claim

Mr. Lankford seeks to impose liability on Clifton under *Monell v. Department of Social Services* for its allegedly unconstitutional customs and practices. "A municipality cannot be held liable [pursuant to § 1983] for the unconstitutional acts of its employees on a theory of *respondeat superior*." *Thomas v. Cumberland County*, 749 F.3d 217, (3d Cir. 2014) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). A plaintiff can, however, prove a violation by demonstrating that his or her "violation of rights was caused by the municipality's policy or custom." *Id.* (citing *Monell*, 436 U.S. at 690–91). Liability may be imposed when a municipality's "policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the 'moving force' behind the constitutional tort of one of its

---

[17] As noted above in footnote 9, Mr. Lankford's New Jersey tort law civil conspiracy claim fails for the same reason as his Section 1983 conspiracy claim.

employees." *Id.* (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1027 (3d Cir. 1991)).

Mr. Lankford claims that Clifton violated his rights by failing to train its officers. When the alleged policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Thomas*, 749 F.3d at 222 (quoting *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 223 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997)). Ordinarily, "a pattern of similar constitutional violations by untrained employees" is "necessary 'to demonstrate deliberate indifference for purposes of failure to train.'" *Id.* (quoting *Connick v. Thompson*, 536 U.S. 51, 62 (2011)). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* Relatedly, an "identified deficiency in a city's training program must be closely related to the ultimate injury"; in other words, "the deficiency in training [must have] actually caused" the constitutional violation. *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989)).

The sole proffered factual basis for Mr. Lankford's *Monell* claim is a set of statistics maintained by NJ Advance Media's Use of Force Database which indicates that officers within Clifton in general, and the individual defendants in particular, use force at a disproportionate rate against Black suspects as compared to White suspects. (DE 46 at 6–12.) Mr. Lankford claims that this evidence shows that Clifton has a policy or custom of racialized policing and that the data was sufficient to put it on notice that its training programs were insufficient to root out this custom. I conclude Mr. Lankford has not established facts which prove a *prima facie* case under *Monell.*

First, Mr. Lankford does not allege or establish any particular deficiency in Clifton's training program. *See Bangura v. City of Philadelphia*, 338 Fed. Appx. 261, 266 (3d Cir. 2009) (dismissing *Monell* claim where "Bangura did not allege any facts to support an inference that the City of Philadelphia follows a deficient policy . . . she did not identify the City's policy on child custody disputes, or set forth any other facts that would suggest an absence thereof"); *see also Rios v. City of Bayonne*, 2015 WL 2400756 at *2 (D.N.J. May 19, 2015) (dismissing *Monell* claim where plaintiff failed to identify specific training policy, state why it was inadequate, or propose an alternative policy); *Labo v. Borger*, 2005 WL 1971867 at *4 (rejecting claim because "Plaintiff cannot point to any actual inadequate training"). Indeed, apart from citing statistics regarding the use of force, Mr. Lankford provides only "generalities, not facts" as to the Clifton Police's training program, making no mention of the presence or absence of any racial bias training or the specifics of the organization's use of force training. *Rios*, 2015 WL 2400756 at *2; *see also McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009) ("[t]o satisfy the pleading standard" for a *Monell* claim a plaintiff "must identify a custom or policy, and specify what exactly that custom or policy was").

Indeed, Clifton explains that its officers undergo use-of-force training consistent with the New Jersey Attorney General's Use of Force policy. (Clifton MSJ at 15.) The mere existence of such a program, of course, does not mean it is sufficient. But it is still Mr. Lankford's burden to identify a deficiency with Clifton's training program which is responsible for the officers' claimed misconduct, or at least to identify the absence of a training program that would have prevented it. He cannot simply identify a racial disparity with respect to arrests, and posit that some undefined defect in the training program must be the cause.

Second, Mr. Lankford provides no "pattern of similar constitutional violations by untrained employees" or any other evidence which indicates that Clifton should have been "on notice" of its allegedly deficient training program.

*Thomas*, 749 F.3d at 223; *Labo*, 2005 WL 1971867 at *4 ("The evidence presented reveals no previous incidents of a similar nature involving any police officers to which the Defendants were indifferent"); *see also Castellani v. City of Atl. City*, 2017 WL 3112820 at *22 (D.N.J. July 20, 2017); *Worral v. City of Atl. City*, 2013 WL 4500583 at *1 (D.N.J. Aug. 30, 2013). Such a pattern would have to be centered on the excessive use of force which is at the heart of the claims here; that is, Lankford would have to show that Clifton was deliberately indifferent to the risk that its officers, because of their poor training, would use excessive force against Black individuals.

The data provided by Mr. Lankford are too general to support such a claim. The data compile instances of use of force, but do not state whether those uses of force were justified or excessive. The data furthermore provide no information as to whether there are any cases factually comparable to this one. *Thomas*, 749 F.3d at 223. They do not place Clifton on notice of any substantial risk that individuals of Mr. Lankford's race would suffer constitutional violations because of its officers' conduct.

Third, Mr. Lankford additionally fails to identify what alternative policy could have averted the alleged constitutional violation which he suffered at the hands of the police officers. *See City of Canton*, 489 U.S. at 391; *see also Labo v. Borger*, 2005 WL 1971867 at *4 (D.N.J. Aug. 15, 2005) (rejecting *Monell* claim where plaintiff "failed to show that a different policy . . . would have prevented the harm"). Indeed, he does not mention any alternative policy at all, even in conclusory terms, much less identify a specific type of training that would have prevented the officers from violating his constitutional rights in this instance. As in *Castellani*, here the undisputed facts demonstrate that Clifton officers do undergo use-of-force training. Mr. Lankford does not identify any deficiency in that training that Clifton was aware of but ignored.

Mr. Lankford's opposition sometimes lapses into a straightforward claim that Clifton had a policy of using excessive force against Black individuals, untethered to any claim of deficient training or supervision. No such claim is

pled in the complaint. *Holland*, 2011 WL 6934969 at *4. In any event, Mr. Lankford provides no evidence at all that Clifton police officers were regularly using excessive force against Black individuals or that Clifton had a policy of encouraging them to do so.

Summary judgment is therefore awarded to Clifton on the *Monell* claim.

## B. Negligent Supervision

To prove a prima facie case of negligent supervision, Mr. Lankford must show: (1) that the employer "knew or had reason to know of the particular unfitness, incompetence, or dangerous attributes of [the employees] who were involved," (2) "could reasonably have foreseen that such qualities created a risk of harm to other persons," and (3) the employer's negligence "proximately caused plaintiff['s] injuries." *Smith v. Harrah's Casino Resort of Atlantic City*, 2013 WL 6508406 at *3 (N.J. App. Div. Dec. 13, 2013); *see also Di Cosala v. Kay*, 91 N.J. 159, 173–74 (N.J. 1982).

This claim fails for many of the same reasons that Mr. Lankford's Section 1983 claim failed. Mr. Lankford simply provides no evidence that indicates that Clifton should have concluded that the officers involved in this case were unfit, incompetent, or dangerous in any way. His sole evidence for this proposition is the N.J. Advance Media Use of Force report, which only shows that the officers used force, not that their uses of force were unjustified. His reference to the percentages of use of force by each officer against Black individuals also falls short of showing bias. One confounding variable, the city notes, is that the data do not show whether particular officers patrol areas of the city more heavily populated by minorities.[18] The officers' disproportionate use of force, then, might simply reflect their patrol patterns rather than any actual pattern of discrimination. The larger point, however, is that these aggregate statistics do

---

[18] This is not to say, of course, that a municipality could not be held responsible for failure to supervise a police officer who has a history of using force against minorities more frequently. Rather, it is only to say that to satisfy his burden on summary judgment, Mr. Lankford must bring forth evidence that actually demonstrates that is the case.

not demonstrate the proposition for which they are cited: *i.e.,* that the City's negligent supervision led to the events at issue here.

In sum, I **GRANT** summary judgment to Clifton as to all of Mr. Lankford's claims against the city.

## V. Conclusion

For the reasons set forth above, I will grant in part and deny in part Officer Buell's motion for summary judgment and grant Clifton's motion for summary judgment.

Dated: June 29, 2021

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**